Statement of the Case.
MONROE, C. J.
This is an appeal from a judgment awarding plaintiff $2,000 as dam *739 ages for an injury sustained by him whilst working in defendants’ employ with an answer by plaintiff praying for an Increase in the award.
We find from the evidence that, when plaintiff received the injury in question, he was in his 30th year, had a wife and four children, was dependent upon his manual labor for their and his support, was receiving wages at the rate of $2.50 a day, and was regarded as competent and reliable. He was employed by defendants as “tong setter” and general utility man in connection with the operation of a timber loader, and, having been furnished by Brown, the “loader man,” who was the boss in charge of the immediate job, with a file wherewith to sharpen his tongs, he had stepped upon the “reaches” of a log car that had been “spotted” for loading in order to return the file to its owner, when, by reason of a backward movement of a locomotive and “trailer,” which were in front of, but detached from, the car, the latter was somewhat violently bumped, or driven back, thereby disturbing his equilibrium and causing him to grasp the “car line,” with the result that the fingers of his left hand were drawn between the line and the “shive” upon which it worked and ground off, leaving only the stumps up to the middle knuckles.
The loader consists in part of a steel frame which straddles a logging railroad, leaving a space between its sides sufficiently wide for the passage of the log cars upon the track and about eight feet high, and having its engine, drum, and other appliances supported at that elevation with a roof over them, wooden sides, with openings, and limited floor space for the accommodation of ail operator known as the “loader man.” It is also provided with wheels (in truck form) which are kept raised within the space thus mentioned while the loader is at work, but which may be lowered to and adjusted upon the track, and thereby made to supply the means of rolling the loader from one position to another. The log cars are strongly built skeletons from the ends of which there project two timbers called “reaches,” which are said to be six inches (or eight inches) square and ten inches apart, and upon and between the ends of which are the draw-heads. There are steel cables which are wound upon a drum that is driven by the engine and extend out over the ends of two beams or derricks which project from one end of the loader and are capable of moving up and down, and the tongs are fastened by their handles to the ends of the cables, so that, when the “tong setter” attaches them by their points to the logs, and the drum is set in motion, winding in the cable, the logs are lifted and loaded upon the car that has been “spotted” to receive them just beyond the end of the loader.
Most of the witnesses speak of the end where the loading is done as the front of the loader, and we shall so consider it for the purposes of this opinion. The locomotive to which we have referred appears to have brought down a train, of 27 log cars, and, as we understand the testimony, had pushed about half of them under and through the loader prior to the accident, the situation just before the accident being that a car had been “spotted” for loading with another car called a “trailer” in front of it, the locomotive in a reversed position in front of the trailer, and about a dozen cars, including one that was under the loader, behind the spotted car, all of the cars and the locomotive being coupled the one to the other. Beyond that the loader man had attached a steel cable (called the “car line,” and which is used for moving the cars backwards and forwards through the loader, putting one after the other in position to be loaded) to the fifth car in the rear, and had tightened it up so as (we infer) to take the slack from between the five cars next behind the trailer, *741 and hold them, including the spotted car, in position during the loading which was about to begin. The “car line,” it may be added, was operated over a “shive” or pulley which stood in the front part of the loader, about breast high and in juxtaposition to a man standing upon the reaches of the loader with a view of placing anything upon its floor or handing anything to a person thereon.
Plaintiff finished sharpening his tongs, and, as Brown’s instructions were emphatic to the effect that his tools should be returned, he undertook to return the file. He was then on the ground on the left side of the loader, and Brown was on the floor of the loader, right side, about one-third of the distance from front to rear, so that plaintiff could neither see nor well communicate with him. There were openings on the left side of the loader, one, called a window, about midway between the ends, and probably ten feet from the ground, and one near each of the ends, which were each, say, eight feet from the ground. The window was inaccessible, and the file, if thrown through it, would probably have fallen into the machinery or into a place where there was no floor. No means of reaching the other openings were provided, and they were blocked with a miscellaneous collection of articles, which suggests the idea that a file thrown among them would have been lost to sight. There were also openings on the right side of the car, and plaintiff might have reached that side by going under the train or over it or around either of the ends. But, according to the evidence, the men who were working under Brown were in the habit of returning his tools in the way that happened to be the most convenient at the moment, and, as plaintiff was a negro, with some ideas apparently upon the subject of responsibility and good manners, and Brown was a white man and his boss, he naturally considered it the proper thing for him to return the file to Brown in a way that would attract his attention to the fact of its return and be most convenient to him,' and, as Brown kept his tools on the right side of the loader, nearer the front than the rear, and was himself on that side, and as about that time Brown ordered the switchman to uncouple the trailer from the spotted car and give the engineer the signal to pull out, and plaintiff saw and heard the switchman obey these orders, he proceeded to the front of the spotted car, which was in juxtaposition to the loader, stepped up on its reaches, attracted Brown’s attention, said, “Mr. John, here is your file,” was told by Brown, who was busy, having his foot on the “friction lever,” to throw the file up on the floor of the loader, and was in the act of doing what he was told, when the trailer, instead of being pulled out by the locomotive, was driven backward by it, thus jarring the spotted car and forcing it backwards, throwing plaintiff off his balance, causing him instinctively, to grasp the car line, which was the nearest thing to him, in order to keep himself from being taken under the floor of the loader, and setting the car line in motion, so that his hand was carried by it into the shive, with the result that has been stated.
Defendants’ learned counsel argues, with his usual ability, that plaintiff was at fault in choosing an unsafe way of doing what he attempted to do when a safe way was open to him, and that defendants were not at fault in the matter of the backing movement of the cars, since that resulted from the taking up or letting out of “slack,” which is incidental and common to the starting or stopping of all trains. But we do not find that the argument is sustained upon either point by the facts which we consider established by the evidence.
Brown, who was defendant’s representative on the spot, says that the men returned his tools in the handiest way, that, if they were on the left side of the loader, they *743 would most always come to the front; that, if he happened to he standing there, they would pitch the tools to him, or, if there was a car there, they would step up on the car. Being asked which was the handiest way, he replied:
“That depends more on where I would be and where the man would be, but in this one [case] think it was just about as handy a way to step up on the car as any other way.”
Opinion.
[1] It may he conceded that there is some danger in one’s taking an unguarded position on a car to which a live locomotive is attached, unless one knows something of the instructions or intentions of the engineer, but the ear upon which plaintiff took his position was not attached to a live locomotive. Plaintiff had himself seen it detached, and he had seen the switchman signal to the engineer to pull the engine and trailer ahead, away from the spotted car. There is no question upon those points. It is not denied that the trailer was actually uncoupled from the spotted car or that the engineer had actually received the order to pull out before plaintiff got on that car, and we are of opinion that plaintiff cannot reasonably be charged with either negligence or assumption of risk in relying upon it that he would obey, instead of disobeying, his orders.
Mr. Satcher, defendants’ woods foreman and witness, testifies that he looks after “everything from the mill out, * * * including railroad and logging,” and that he has seen men get up on the reaches of a car to return to the loader man his tools, though not so very often, and as follows:
“Q. It didn’t strike you, when you saw the men doing it, * * * as being especially dangerous? A. No. Q. If this man hadn’t been hurt and nobody else had been hurt, you would be of the same opinion now, would you? A. Yes; of the same opinion.”
And yet he does not seem to distinguish between a car attached to a live engine and an engineer whose orders are unknown from a car that'is detached from an engine standing in juxtaposition thereto, but the engineer of which is known to have received an order to pull away from it. As to the backward movement of the car, evidence fixes the responsibility on the engineer with remarkable certainty. In the first place, he admits that he had no license as. an engineer; says that he had been given a certificate by an officer of a railroad that he names, but also says that he was employed by defendants without being asked to show even that though he had previously worked as a fireman. Taylor, his fireman at the time of the accident here in question, testifies that, when Honnell (the acting engineer) received the order to go ahead, the locomotive began backing, and that, as Honnell seemed unable to reverse the lever, he (Taylor) jumped off the seat box and helped him to reverse it, and, whilst Honnell denies that the incident occurred as thus stated, he admits that the lever had been stiff but a short time before. He judged (from casual observation) that there was a down grade of about 1% per cent, in the direction of and beyond the loader, and, being interrogated by defendants’ counsel, he answered as follows:
“Q. Now, you understand what is termed taking slack out of a train, when the brakes are removed, preparatory to starting it; I will ask you if anything of that kind happened there? A. No, sir; I didn’t have to take any slack to get away from there. Q. You don’t remember that it lot the slack out of the cars at all? A. No, sir; might have been a little slack, no great amount. Q. With an engine and car, or cars, on a grade, as that was, what is the usual effect of releasing the air at the engine? A. The slack will run out of a train where there is a grade like this. Q. Now, in this slack going out of a train, does it cause the cars to move down or towards the engine? A. Down the grade. Q. At this time do you remember whether or not the slack running out of the cars caused from cars to move? A. Yes. Q. Which way did it cause the cars to move, if at all? A. From the engine. Q. Did the engine move at all when the cars moved from it? A. Ye.s; it moved some; the slack in the cars pulled the engine back, say, eight or ten inches, maybe a foot.”
*745 On bis cross-examination be said that be did not know whether or not the trailer bad been uncoupled when he got the signal to go ahead; did not know whether, when he went ahead, he carried only the “trailer cars” or others also, and that he had come down there with the lever reversed, “in back motion,” but did not remember whether it was in that condition when he got the signal to go ahead, and as follows:
“Q. You didn’t go back at all, did you? A. I told you that there might have been some slack; the engine, being on a grade, might have run back some four or five inches. * * * Q. Did the engine go back at all? A. I told you about four or five inches. * * . * Q. There is always a little jar, isn’t there? A. A little slack; it moved back two or three inches, something like that.”
The uncontradicted evidence showing that all the cars had been uncoupled except the one trailer, the notion that the slack “in the cars” pulled the engine back eight or ten inches or a foot was abandoned by the witness, who then came down to four or five inches and then to two or three inches that the engine might have fallen back, which, however, fails to account for the fact that the spotted car, and the four others behind it, though held in position by a steel cable wound around a drum and drawn taut, so that there was no slack between them, were forced back something like three feet. Speaking of the grade, Mr. Honnell said “I would guess it to be one and a half per cent.,” and he further said that “it isn’t practical” to give an engine steam enough to hold it on such a grade before releasing the brakes. Other witnesses testified that it was the safe thing to do, and- among them Mr. Satcher, who said that he could think of no better way to do it.
[2] Dr. Perkins, asked to state the nature of plaintiff’s injury, said:
“Well, his hand, * * * the first and second joints are mashed and ground off, all the nerves and tissue ground off, bone broken, * * * second or middle joint to the ends of the fingers.”
And from his testimony and that of other physicians it appears that spicula of bone were still working out when the case was tried, in April, 1914, and that it was altogether uncertain when the wound would be entirely healed, and altogether certain that, as plaintiff will never be able to close the joints that are left (being those that are nearest thereto) against the palm, he will never be able to grasp anything in his left hand, which is the more unfortunate, as he is shown to be left-handed.
Our conclusion then is that the judgment appealed from should be amended by increasing the amount of the award to $3,000, and, as amended, affirmed; and it is so ordered.